UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACI RUSSELL,

     Plaintiff,

v.                                                  Case No. 20-10221
                                                    Honorable Victoria A. Roberts

THREE PILLARS d/b/a
CORNERSTONE EDUCATION
GROUP,

     Defendant.

_____/

**ORDER: (1) GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [ECF No. 28];
(2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT [ECF No. 27]; and (3) DISMISSING THE CASE**

## I.   INTRODUCTION

Staci Russell brings this employment discrimination suit against her

employer, Three Pillars d/b/a Cornerstone Education Group ("Cornerstone").

She claims Cornerstone demoted her and denied her a promotion based on

her sex.  Before the Court are Cornerstone's motion for summary judgment

[ECF No. 28] and Russell's motion for partial summary judgment [ECF No.

27].

For the reasons below, the Court **GRANTS** Cornerstone's motion and

**DENIES** Russell's.  The case is **DISMISSED**.

## II. BACKGROUND

Cornerstone is a charter school management company that operates five public school academies in Michigan, including Cornerstone Health + Technology High School ("Cornerstone High School" or "the High School").

Russell began working for Cornerstone in July 2012 as a Course Manager at the High School. She is the longest tenured Cornerstone employee assigned to work at the High School. During her tenure with Cornerstone at the High School, Russell held positions as Course Manager, Dean of Students, Dean of Academics/Academic Dean, and Interim Principal.

Cornerstone promoted Russell from Course Manager to Dean of Students in February 2014. The role of Dean of Students does not require an administrator/administrative certification.

In June 2015, Cornerstone fired the High School's principal and named Russell Interim Principal. She served in that capacity for just over a month. Then, Cornerstone hired Jared Davis as Principal and Russell returned to her Dean of Students position.

On July 13, 2016, Russell began serving as the Dean of Academics. Russell says this was a promotion. Evidence shows her salary increased by $12,000 when she became Academic Dean. The Academic Dean position

requires an administrative certification, although an individual can occupy the position while enrolled in an administrative certification program for up to three years.  Russell received her certification in March 2017.

Cornerstone says it created the Academic Dean position for Russell and it was not a promotion.  Davis testified that Cornerstone gave Russell the Academic Dean position because "[she] should be compensated at a higher rate and perhaps be given a title that would warrant such because as [the High School] started to double the enrollment there was more responsibility and more things [for Russell] to do."  [ECF No. 28-8, PageID.579].

Cornerstone also hired Scott Humphrey as a second Academic Dean in July 2016.

On July 1, 2019, Grand Valley State University ("Grand Valley") – the authorizing entity for Cornerstone High School – reauthorized the High School's charter for three years – the shortest possible charter term length. It concluded the High School was "weak" based on its academic outcomes and processes for school improvement related to the curriculum and teacher stability.

Later that month, Cornerstone hired Lisa Key to serve as its Chief Academic Officer.  In that role, Key oversaw and was responsible for

academics and educational programs at Cornerstone's schools.  Key believed Academic Deans should spend 80% of their time on instructional leadership and the other 20% on other tasks (the "80/20 Rule").

Key said that she was aware early in her tenure that the High School lacked the proper academic and instructional support required to be successful.  Her conclusions were based on observations throughout the school and of the leadership team, meetings with her team, parent calls, and how things were set up.  Key testified that "leadership spent a lot of time on management and not instructional leadership. And it should be just the opposite. Eighty percent of the time should be on instructional leadership, and 20 percent on management."  Key observed that one of the underlying problems was that Russell spent much of her time on management-related tasks instead of on the instructional leadership responsibilities she believed Academic Deans should handle.

On November 23, 2019, Key sent an internal email to Cornerstone's CEO, Mindy Barry; its Director of Human Resources, Helena Parks; its Senior Executive Director of Curriculum, Laura Frey-Greathouse; its Director of Federal and State Funds, Tracy Walker; and a few of Cornerstone's other executive-level staff members.  She voiced concern over the lack of proper

academic and structural support at the High School and informed them she

planned to move Russell to a Dean of Students position:

> On Friday, Mindy [Barry] and I met with Jared Davis. We met in regard to another topic, but our conversation led me back to an issue that I discovered early on when I came to Cornerstone which is that **the [High School] lacks the proper leadership as well as academic and instructional support it requires to be successful**.

> After the meeting with Mr. Davis, I asked [Laura Frey-Greathouse] to talk with Tracy [Walker] who was with her during the Academic Team's regularly scheduled collaboration and work time yesterday. The question I posed was around Title funding and carryover.

> It is projected that we will have some carryover funds that would cover another dean, at least for the remainder of this school year. Although, I don't like to use carryover for people, in this case **I know that we need to begin to move forward with leadership changes to improve outcomes at the HS** and there is a high probability of more changes between now and the end of the school year.

> With that, I plan to talk with Mr. Davis about **some plans of improvement which include moving Ms. Staci Russel [sic] to Dean of Students to assist with student behavior and culture**. We would also put her on a plan of improvement to support her in this transition. The plan would be a 90-day plan **and my hope is that this would be a better fit for her skills and/or that she would improve her performance**. It would also provide Mr. Davis with needed support in student culture and behavior.

> **Regardless, instructional leadership is not where Staci's skill set is, and I can't afford to not support the teachers and students as we work to improve student progress and achievement**. We would use carry-over to fund Staci's position. This will leave the Academic Dean position that Staci

vacates open. I plan to talk to Jared no later than Tuesday and will advise you at that time to post a new AD position at the HS. I wanted to give everyone a heads up. Please let me know if there are any questions or concerns. **This is step one of my plans. I am still reflecting on next steps relative to Mr. Davis' performance**.

[ECF No. 28-10, PageID.598 (emphasis added)].

With respect to her belief that Russell spent significant time on tasks

not consistent with the Academic Dean position, Key testified:

Some examples include a lot of e-mails coming from Ms. Russell in regards to enrolling new students and creating master schedules. My observations in the building when I am there and she's helping with technology and she's -- and Mr. Davis shares with me that she's helping with subs and helping with a lot of the management stuff.

Mr. Davis shared with me that he treats her as an assistant principal and that he needs her to do those management things and that he needs her to help with the student issues and other things that are going on. That he is shaping her to be his assistant principal, from, you know, whatever his background is that he's had, which is different than what an academic dean which is focused on coaching and making sure high quality instruction and curriculum.

So as I see these e-mails and different tasks that Ms. Russell -- from the very first time that I met her, the very first meeting I think I had with her team in August, and we were meeting about scheduling and where I learned that Ms. Russell did the master schedule, the entire master schedule, and as kids were enrolling and she's enrolling with doing enrollment numbers and things like that . . . . [T]hese are some examples, not all, of times [she] spent doing tasks outside of an academic dean position."

[ECF No. 28-1, PageID.462].  Key also observed that Russell "had a passion and skill set of working with the kids, student culture. She liked to do – usually when I observed or I saw e-mails a lot of the things that I was seeing seemed to be that that's where her passion, that she – that's where she spends her day."  [*Id.*].

On November 26, 2019, Key informed Russell that she planned to transfer her to a Dean of Students position.  That same day, Cornerstone gave Russell an offer letter to serve as Dean of Students.  Russell's rate of pay and benefits did not change.

Russell accepted the position on December 3, 2019.

On December 6, 2019, Cornerstone fired Davis as Principal.  Russell did not apply for the Principal position; Humphrey did apply.

Phillip Price, a principal at a different Cornerstone school, served as the Interim Principal at the High School from December 6 until December 16, 2019.  Cornerstone then selected Humphrey as the Interim Principal. Humphrey served only six weeks.  Cornerstone then announced that Ernestine Sanders, a Black female, would serve as Interim Principal until the end of the 2019-2020 school year.  Humphrey returned to his Academic Dean position.  Cornerstone hired a Black female to fill Russell's Academic Dean position.

Cornerstone gave Russell a bonus in December 2019 and a raise in 2020, and she claims no financial disparity with her peers. She also admits that she has not suffered economic damage due to her transfer to the Dean of Students position.

Russell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she believed Cornerstone demoted her to Dean of Students "because of [her] Sex-Female, and Race-Black/African American."  The EEOC issued a right to sue letter on January 27, 2020.  Russell filed this action two days later.

Russell asserts two causes of action: (1) sex discrimination in violation of Title VII; and (2) sex discrimination in violation of the Elliott-Larsen Civil Rights Act ("ELCRA").

Under each count, Russell alleges that Cornerstone discriminated against her in two ways: (1) by demoting her to Dean of Students based on her sex; and (2) by denying her a promotion to Principal based on her sex in favor of a less qualified male.  Although raised in her EEOC charge, Russell did not file a race discrimination claim in this Court.

Both parties move for summary judgment – although Russell only seeks summary judgment with respect to her claim of wrongful demotion, not on her failure to promote claim.  The motions are fully briefed.

8

## III.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The movant bears the initial burden to inform the Court of the basis for its motion; it must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the non-moving party must set forth specific facts showing a genuine issue for trial.  *Id*. at 324.  Unsupported, conclusory statements are insufficient to establish a factual dispute to defeat summary judgment, as is the "mere existence of a scintilla of evidence in support of the [non-movant's] position"; the evidence must be such that a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court need only consider the cited materials, but it may consider other evidence in the record.  Fed. R. Civ. P. 56(c)(3).  The Court's function at the

summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation."  *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).

## IV.   ANALYSIS

The Court analyzes Russell's Title VII and ELCRA claims using the same evidentiary framework.  *Humenny v. Genex Corp*., 390 F.3d 901, 906 (6th Cir. 2004).

"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).  Since Russell does not present direct evidence of discrimination, she must prove disparate treatment through the *McDonnell Douglas/Burdine* burden-shifting framework.  *Id*.; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

This framework first requires the plaintiff to establish a *prima facie* case of discrimination. *Johnson*, 215 F.3d at 572.  If the plaintiff does this, "a

10

mandatory presumption of discrimination is created and the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 573 (citation omitted). "If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

## A. Russell's Demotion Claim

Russell alleges that her transfer from the Academic Dean position to the Dean of Students position was a demotion and that Cornerstone's decision to demote her was based on her sex.

Cornerstone says it is entitled to summary judgment on this claim because Russell cannot establish a *prima facie* case of sex discrimination. Alternatively, it argues that even if Russell establishes a *prima facie* case of discrimination, it articulates a legitimate, nondiscriminatory reason for eliminating her position, and Russell fails to show that Cornerstone's reason was pretextual.

### i. *Prima Facie* Case

To establish a *prima facie* case of sex discrimination, Russell must show: (1) she is a member of a protected class; (2) she was qualified; (3) she was subjected to an adverse employment action; and (4) she was treated differently than a similarly-situated male employee for the same or

similar conduct.  *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999).

Cornerstone does not dispute that Russell is a member of a protected class or that she is qualified for the Academic Dean position.  However, it says Russell did not suffer an adverse employment action and that it did not treat her less favorably than a similarly-situated male employee for the same or similar conduct.

Russell demonstrates that a genuine issue of material fact exists with respect to each of these elements of her *prima facie* case.

### a.  <u>Adverse Employment Action</u>

An "adverse employment action" is one that results in a "materially adverse change in the terms of . . . employment."  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). To be considered materially adverse, "a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 886 (citation omitted). "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id.* at 885.  However, if an employee receives "*significantly diminished* material responsibilities," the employment action may be one that is materially adverse.  *Id*. (citation omitted).  In determining

whether an employment action is materially adverse, the Court should consider whether there was "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id*. (citation omitted).

The Court finds there is a question of fact over Cornerstone's employment action and whether it resulted in a materially adverse change in the terms and conditions of Russell's employment. While Cornerstone did not reduce Russell's compensation or benefits, Russell sets forth evidence which would allow a reasonable jury to find that the responsibilities of a Dean of Students are significantly diminished compared to those of an Academic Dean. Particularly, Russell points out that while a Dean of Students does not require an administrator's certification to carry out its student discipline responsibilities, an Academic Dean must have an administrator's certification (or be working toward one) to administer instructional services and evaluate teacher performance. She contends that as Academic Dean, she evaluated and supervised certified teachers, which is not part of her responsibilities as Dean of Students.

Because a jury could find that the duties of a Dean of Students are significantly diminished compared to those of an Academic Dean, there is a

question of fact regarding whether Russell's transfer resulted in a materially

adverse change in her employment terms and conditions. *Kocsis*, 97 F.3d at

885-86.

### b. <u>Treated Differently than a Similarly-Situated Male</u>

"To be considered 'similarly situated' under the fourth element, 'the

plaintiff and the employee with whom the plaintiff seeks to compare himself

or herself must be similar in all of the relevant aspects.'" *Jones v. City of*

*Franklin*, 468 Fed. Appx. 557, 562 (6th Cir. 2012) (citation omitted).

One way Russell can establish this element "would be to show that the

employees with whom [she] seeks to compare . . . herself reported to the

same supervisor, were subject to the same standards, and 'engaged in the

same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them for it.'"

*Id*. (citation omitted).

Russell compares herself to Humphrey – the other Academic Dean.

She says that Humphrey was similarly situated to her and that despite

complaints about his job performance, Cornerstone did not demote him to a

Dean of Students position.

Cornerstone says Russell and Humphrey are not similarly situated

because Russell held different responsibilities than Humphrey.  Specifically,

14

it says Russell coordinated summer school and state and local testing; and created testing schedules, goal sheets for students after they took standardized tests, and the master schedule for the school. Cornerstone says Russell also verified teachers submitted grades, tracked teacher attendance, and generated progress reports and report cards. Finally, Cornerstone disputes that Russell and Humphrey engaged in the same or similar misconduct. The Court disagrees.

Russell demonstrates that she and Humphrey as Academic Deans reported to the same supervisor. Moreover, although she had responsibilities that Humphrey did not, both were responsible for teacher observations and evaluations. They also were subject to the same standard – i.e., the 80/20 Rule implemented by Key which required Academic Deans to spend 80% of their time on instructional leadership and the other 20% of their time on other tasks. At a minimum, Russell demonstrates that a question of fact exists regarding whether the two Academic Deans were similarly situated.

Russell also shows that her alleged misconduct (i.e., failing to spend 80% of her time on instructional leadership responsibilities such as observing and coaching teachers) was similar enough to Humphrey's alleged misconduct for a jury to conclude that she established this element

of her *prima facie* case. Humphrey's alleged misconduct was "not coming out of his office," "[s]taying in his office," and "[taking long] [l]unches." As Russell says, this is similar enough to her alleged conduct because it prevented Humphrey from spending 80% of his time observing and coaching teachers. Sufficient factual evidence is presented from which a reasonable jury could conclude that Russell's alleged misconduct – and Humphrey's similarly – related to not spending 80% of their time on instructional leadership and failing to abide by Key's 80/20 Rule.

Finally, Russell shows that she and Humphrey were treated differently. Cornerstone transferred Russell to a Dean of Students position. Humphrey remained an Academic Dean.

Russell puts forth sufficient evidence that would allow a jury to reasonably conclude that she and Humphrey were similarly situated employees, and that she was treated differently than he, for the same or similar conduct.

Russell presents enough material fact to establish a *prima facie* case of sex discrimination.

### ii. Legitimate Non-Discriminatory Reason

Cornerstone says that even if Russell establishes a *prima facie* case of discrimination, it is entitled to summary judgment because it articulates

legitimate, nondiscriminatory reasons for transferring Russell to the Dean of Students position – i.e., her poor performance and a personnel decision based on its desire to change the manner in which it conducts its business – and Russell fails to show that Cornerstone's reasons were pretextual.

As the Sixth Circuit recently explained:

> Once the plaintiff presents a prima facie case of discrimination, the burden of production falls on the defendant to articulate a 'legitimate, non-discriminatory reason for the adverse employment action.' This is not a burden to 'persuade the court that it was actually motivated by the proffered reasons.' The defendant only has to present 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'

*Harris v. City of Akron, Ohio*, 836 Fed. Appx. 415, 419 (6th Cir. 2020) (internal citations omitted). Cornerstone satisfies this burden.

Poor performance and personnel decisions based on a desire to change the manner in which business has been conducted are legitimate, non-discriminatory reasons for employment actions. *See Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011); *Hazle v Ford Motor Co.*, 464 Mich. 456, 472-73 (2001); *Lewis v. City of Detroit*, No. 14-13091, 2016 WL 67600 at *8-9 (E.D. Mich. Jan. 6, 2016).

Russell argues that Cornerstone fails to put forth any documentary evidence regarding why it "demoted" her from Academic Dean to Dean of

Students.  She also says Key's reasons for the personnel decision are not reasonably clear or specific.  Both of Russell's arguments fail.

Cornerstone says Key concluded that the High School lacked the proper academic and instructional support required to be successful, and she formulated a plan to improve the High School's performance.  As explained in her November 23, 2019 email, the first step in Key's plan was to transfer Russell to a Dean of Students position that was created just for her. Key provided clear and specific reasons in her email for making this personnel decision – namely that Russell was spending much of her time on responsibilities that were consistent with a Dean of Students position, which prevented her from spending 80% of her time on instructional leadership tasks in accordance with the 80/20 Rule.  Key also explained that instructional leadership was not Russell's skillset, and that she hoped moving her to the Dean of Students position would be a better fit for Russell's skills and would provide the High School with needed support in student culture and behavior.

Other evidence supports that Key's decision to transfer Russell was based on a legitimate, non-discriminatory reason.  Shortly before Key made the personnel decision, Grand Valley had classified the High School as a "weaker school" based on its academic outcomes and processes for school

improvement related to curriculum and teacher stability.  Moreover, before Key sent the November 23, 2019 email, Frey-Greathouse advised key that Russell was not best suited for the responsibilities of an Academic Dean and that she did not believe Russell spent 80% of her time on instructional leadership.  Finally, shortly after Key transferred Russell to the Dean of Students position, she took her next step in her plan to improve the academic performance at the High School: she fired Davis – a male – as Principal.

Cornerstone meets its burden to provide a legitimate, non-discriminatory reason for reassigning Russell to a Dean of Students position.

### iii.    Pretext

Since Cornerstone put forth a legitimate, non-discriminatory reason for its personnel decision, Russell must rebut the proffered reason and show that it was a pretext to hide discrimination.  *Johnson*, 215 F.3d at 573.  She can establish that the proffered reason was a mere pretext by showing that it: (1) had no basis in fact; (2) was not the actual reason; and (3) was insufficient to explain the defendant's action.  *Id*.  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *Id.* (citation omitted).

Russell merely disagrees with the reasons Cornerstone gave for transferring her to the Dean of Students position, and she contends that Key was wrong about her performance and skills.  However, she falls far short of meeting her burden to survive summary judgment.  She fails to show "that the reason was false."  *See Johnson*, 215 F.3d at 573.  And she also fails to show "that discrimination was the real reason."  *Id*.

The Court GRANTS Cornerstone summary judgment on both counts of the complaint with respect to Russell's demotion claim.

### B.   Russell Failed to Exhaust Administrative Remedies with Respect to Her Title VII Failure to Promote Claim

Cornerstone says Russell's "promotion" claim is barred because she failed to first present it to the EEOC.  The Court agrees.

A party alleging employment discrimination in violation of Title VII must exhaust administrative remedies by filing an administrative charge with the EEOC before bringing suit in federal court.  *See* 42 U.S.C. § 2000e-5(e)(1); *Love v. Pullman Co.*, 404 U.S. 522, 523 (1972); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  *Younis*, 610 F.3d at 361.  "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in

20

[her] EEOC charge."  *Id.*; 42 U.S.C. § 2000e–5(f)(1).  At the same time, the Court must liberally construe EEOC charges filed *pro se* and "consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge."  *Id.* at 362.

In her EEOC charge, Russell noted that she was demoted to Dean of Students on December 9, 2019 and she alleged that she was "demoted, and discriminated against, because of [her] Sex-Female, and Race-Black/African American."  Under the "Date(s) Discrimination Took Place" section, Russell responded that both the "Earliest" and "Latest" date of the discrimination was December 9, 2019 – i.e., the date she assumed the Dean of Students position – and she did not check the box indicating the discrimination was a "continuing action."  Russell did not allege that Cornerstone discriminated against her by failing to promote her to the principal position; nor did she say she was discriminated against on December 13 or 16, 2019 – the date Cornerstone announced the new Interim Principal and date the new Interim Principal assumed his role, respectively.

Although the Court must liberally construe the EEOC complaint "to encompass all claims 'reasonably expected to grow out of the charge of discrimination," *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (citation omitted), Russell's failure to promote claim is not one

reasonably expected to grow out of her EEOC charge, which is limited to a single employment action – i.e., her alleged demotion to Dean of Students – that occurred on a single day.  While it is understandable for a *pro se* party to fail to allege every specific legal claim she may raise, a complainant must identify the specific factual conduct she believes is discriminatory.  Indeed, "[i]t does not constitute an unjustifiable burden . . . to require [a claimant] to specify each . . . event" or "identify that conduct which [s]he felt was the result of [sex] discrimination."  *Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir. 1986).

Because Russell did not identify Cornerstone's failure to promote her to Principal as one of the discriminatory acts in the EEOC charge, she failed to exhaust administrative remedies for this claim under Title VII and is barred from filing it in this Court.

The Court GRANTS Cornerstone summary judgment on Russell's Title VII claim with respect to her failure to promote allegation.

### C.    Russell Fails to Establish a *Prima Facie* Case of Sex Discrimination Under the ELCRA Based on a Failure to Promote

Russell's last remaining claim is her failure to promote claim in violation of the ELCRA.  The only difference between this claim and a Title VII failure to promote claim is the exhaustion requirement discussed above.

To establish a *prima facie* case of sex discrimination based on Cornerstone's failure to promote her, Russell must show: "(1) she belongs to a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and denied the position . . .; and (4) an individual of similar qualifications who was not a member of the protected class received the promotion."  *Crane v. Mary Free Bed Rehab. Hosp.*, 634 Fed. Appx. 518, 524 (6th Cir. 2015) (construing ELCRA failure to promote claim).  "The fourth prong of a prima facie case for claims under the ELCRA [requires] a plaintiff to show that she was rejected under circumstances giving rise to an inference of unlawful discrimination."  *Id.* at 524 n.5 (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 134 (2005)).

Cornerstone says this claim must be dismissed because Russell cannot establish that she even applied to be Principal, let alone that she was considered for and denied the promotion.

It is undisputed that Russell did not apply for the Principal position. However, the Sixth Circuit recognizes two situations where a Title VII plaintiff's failure to apply for a position is not fatal to her case.  One situation is where an employer's history of "gross and pervasive discrimination" has created an "atmosphere of futility" in which "employees understand that their applying for certain positions is fruitless."  *See Wanger v. G.A. Gray Co.*,

872 F.2d 142, 145 (6th Cir. 1989) (citation omitted); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977).  The other is where an employer "promotes employees into the position[] in question without asking for applications or posting the opening so that employees could apply for the position[]."  *Wanger*, 872 F.2d at 145 (citation omitted).  In the latter scenario, a plaintiff need only show that "had she known of an ... opening, she would have applied."  *Id.*

Russell attempts to show the first exception applies based on her recent transfer to the Dean of Students position.  However, she fails to present evidence showing that Cornerstone had a history of "gross and pervasive discrimination" against women which made applying for the Principal position fruitless.  Indeed, Cornerstone named Russell the Interim Principal in the past and had given her raises and bonuses throughout her employment.  Moreover, women held an overwhelming majority of Cornerstone's leadership positions – demonstrating that it had not created an "atmosphere of futility" based on discrimination against women.  [*See* ECF No. 28-2, PageID.502].

Neither exception to Russell's duty to show she applied for the Principal position has any bearing here.  Russell's failure to apply dooms her promotion claim as a matter of law.

The Court GRANTS Cornerstone summary judgment on Russell's

ELCRA claim with respect to her failure to promote allegation.

## V.  CONCLUSION

The Court **GRANTS** Cornerstone's motion for summary judgment and

**DENIES** Russell's motion for partial summary judgment.

The case is **DISMISSED**.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 13, 2021